Filed 10/22/13

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ALL TOWING SERVICES LLC,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>CITY OF ORANGE et al.,<br><br>    Defendants and Respondents. | G047336<br><br>(Super. Ct. No. 30-2011-00456419)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, John C. Gastelum, Judge. Affirmed.

Farnell & Norman, Ronald E. Norman and Alicen D. Pittman for Plaintiff and Appellant.

Woodruff, Spradlin & Smart and David A. DeBerry; Wayne W. Winthers, City Attorney, for Defendants and Respondents.

---

[*]    Pursuant to California Rules of Court, rule 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.B.1.

All Towing Services LLC (All Towing) appeals from the summary judgment entered in favor of the City of Orange (city) and its city council members, Denis Bilodeau, Jon Dumitru, and Fred Whitaker on All Towing's conflict of interest claims arising from the award of a vehicle towing contract. All Towing contends triable issues of fact prevented summary judgment. As we explain, however, All Towing failed in its opposition to summary judgment to identify any disputed facts suggesting Whitaker had a conflict of interest, and as a matter of law the $250 or more in campaign contributions Bilodeau and Dumitru received in an earlier election cycle do not create a conflict of interest. We publish our discussion of the latter issue to explain the error of a contrary statement in *BreakZone Billiards v. City of Torrance* (2000) 81 Cal.App.4th 1205, 1227 (*BreakZone*).

I

FACTUAL AND PROCEDURAL BACKGROUND

In the fall of 2010, the Orange Police Department solicited bid proposals to perform towing services for the Official Police Towing and Services Storage (OPTS) program under contract with the city (OPTS agreement, or OPTSA). Under the OPTSA, the police department calls tow operators on a rotational basis whenever it needs vehicles towed for police purposes, such as after an accident or as part of a criminal investigation. According to All Towing, the police department screened and scored the proposals it received before submitting them to the city council for a final decision and, of the seven tow companies submitting bids, All Towing earned the third highest score.

The city alerted the seven companies it would award OPTS towing contracts at a city council hearing on January 25, 2011, but All Towing regarded the meeting as a formality "where matters are routinely approved," and did not appear. All

2

Towing later explained that one of its owners and the person who prepared its bid proposal, Norma Odeh, did not attend the hearing because she was caring for her mother, who died four days later. All Towing did not send anyone in her place.

The city council voted at the hearing to award OPTS contracts to five towing companies, and All Towing was not among them. The council initially awarded only four contracts, expressing reservations about one of the bidders, California Coach. But a California Coach representative addressed the council's concerns at the meeting and, before it adjourned, the council voted 3-2 to award a fifth towing contract to the company. The council, however, did not execute the contracts immediately.

All Towing's lawyer complained in a letter to the city soon after the council meeting that two tow operators receiving OPTS contracts had poor qualifications and that three of the five scored lower than All Towing on the police department's screening criteria. The letter also alleged that at the OPTSA city council meeting "Councilmember Fred Whitaker mentioned that he had checked the public records and discovered that [All Towing] had a collection dispute with a large tax provider for the City of Orange (SC Fuels)" and, "[f]or that reason, Mr. Whitaker . . . disqualif[ied] our client from the process." The letter complained that Whitaker failed to disclose he previously had been a vice president and general counsel for SC Fuels and that when he rejoined his law firm, Cummins & White, SC Fuels remained one of the firm's clients.

The letter asserted a conflict of interest based on Whitaker's association with SC Fuels, but also explained "Mr. Whitaker was mistaken" in assuming a connection between SC Fuels' debtor and All Towing. The letter explained the debtor on the SC Fuels lien, American All-Star Towing, was not the same entity as All Towing, which was only doing business as American All-Star Towing. Counsel explained in a

3

subsequent letter that the original American All-Star Towing had gone out of business in 2009, and All Towing simply purchased its assets at that time, but was not liable for the SC Fuels debt.

All Towing's letters also explained that purported concerns raised at the city council meeting about the financial condition of All Towing's owners were similarly misplaced. While an owner of the original American All-Star Towing company, Naji "Nick" Feghali, was now a manager at All Towing, a bankruptcy court discharged any individual liability he had on the SC Fuels debt, and All Towing's owners and All Towing itself were "financially strong." All Towing declared "the personal bankruptcy of [its] manager . . . was not a reason to disqualify the company."

All Towing also complained that "[a]t least 2 councilmembers" received campaign contributions "from other towing companie[s] who were applying for the contract." All Towing claimed the unnamed "councilmembers should not have participated in the voting."

Based on All Towing's complaints, the city council agreed to revisit the OPTS contracts. The city attorney notified the tow operators that had been approved in the previous hearing that the city council would "be reconsidering its January 25, 2011, decision to not include [All Towing] on the list of tow contractors" at a new hearing on February 22, 2011. The letter advised that while the city council "may limit its discussion to consideration of [All Towing], it is not required to do so. You may want to have a representative attend the meeting, as the ultimate decision of the City Council may have an impact on your operation."

Whitaker recused himself at the February 22 city council hearing to avoid any appearance of a conflict involving "one of my firm's clients, Cardlock Fuels, a

4

member of the S.C. Fuels companies . . . ." Counsel for All Towing reiterated at the hearing the concerns All Towing expressed in its letters, explaining again that All Towing was not the same entity as the former American All-Star Towing (All-Star). In effect, counsel explained Whitaker had no actual conflict of interest with All Towing based on his association with SC Fuels, since All-Star and *not* All Towing had failed to pay SC Fuels' fuel bill, resulting in the lien. All Towing was a different entity that had simply purchased All-Star's assets and, since All Towing had new and different owners who were financially sound and validly organized as a new limited liability company, All Towing was not merely a continuation of All-Star under a different name. But All Towing did not request that Whitaker, now apprised of the true facts, withdraw his recusal and participate in the hearing.

All Towing and two of the tow operators who were awarded OPTS contracts at the January 25 hearing suggested rescinding some of the contracts so that only a total of four tow operators would tow for the police. Each asserted they should be among the four.

After considering the matter, the four remaining city council members decided not to eliminate any of the five previously approved companies from the OPTS program. One of the council members then made a motion to include All Towing in the program, and he was joined by another council member, but council members Bilodeau and Dumitru voted against expanding the program to six tow operators. Accordingly, the motion to include All Towing failed on a 2-2 vote. Though All Towing had not wanted Whitaker included in the vote, All Towing complained that with only four members left to vote at the rehearing, All Towing labored under the burden of securing 75 percent

approval (a 3-1 vote) to secure an OPTS contract, while the other companies at the January 25 hearing only required a 3-2 vote, or 60 percent approval.

Within a month of the February 22 rehearing, All Towing filed the present lawsuit seeking to void the OPTS contracts and enjoin Whitaker, Bilodeau, and Dumitru from participating in any rehearing. The complaint asserted four causes of action. The first cause of action against Whitaker and the city asserted Whitaker's participation in the initial hearing in January 2011 violated the Political Reform Act of 1974 (Gov. Code, § 81000 et seq.; hereafter "PRA"; all further undesignated statutory citations are to this code) based on Whitaker's alleged "financial interest in the awarding of the OPTS contract."

The second and third causes of action similarly asserted the city, Bilodeau, and Dumitru violated the PRA's provisions against financial conflicts of interest because Bilodeau and Dumitru each "received campaign contributions of $250.00 or more from at least two of the six companies other than plaintiff vying for the OPTS Agreement within just a few months (less than a year)" before the initial January 2011 hearing. According to the complaint, "These campaign contributions signify that" Bilodeau and Dumitru each had under the PRA a prohibited "*per se . . .* financial interest in the awarding of the OPTS contract."

The fourth cause of action asserted Whitaker, Bilodeau, Dumitru, and the city violated a general "common law conflict of interest" prohibition based on the same allegations underlying the first three causes of action. All Towing alleged under the fourth cause of action damages "in excess of two million dollars."

The trial court granted All Towing's initial ex parte request for a temporary restraining order in March 2011 but, after a hearing and briefing by the parties,

subsequently denied All Towing's request for a preliminary injunction, finding it was unlikely to prevail on the merits.

Defendants in January 2012 filed their motion for summary judgment or, in the alternative, summary adjudication. They asserted in their motion they were entitled to judgment as a matter of law because: (1) it was not foreseeable that a decision on the OPTS contracts would affect Whitaker's financial interest in any manner; (2) any conceivable conflict was rectified by his subsequent recusal; and (3) the campaign contributions Bilodeau and Dumitru received and reported in a previous election cycle did not constitute a conflict of interest under the PRA or common law.[1]

All Towing filed its four-page opposition to summary judgment and a cursory separate statement of facts at the hearing on the motion in April 2012, without any advance notice to defendants or leave from the court to file a late opposition. The opposition conceded defendants' "basic factual presentation" in its summary judgment motion was correct, with unimportant quibbles. All Towing's opposition did not address Whitaker at all and instead focused on Bilodeau and Dumitru, arguing the undisputed campaign contributions they received constituted a conflict of interest.

The trial court granted defendants' summary judgment motion on the merits instead of faulting All Towing for its late opposition. The court concluded All Towing failed to raise a triable issue of fact that any of the council members had a conflict of interest under the PRA or common law and All Towing was required to raise its common law conflict of interest claim by a petition for a writ of administrative mandamus, which it failed to do. In any event, the trial court concluded a mandate petition would have

_____

[1] All Towing's preliminary injunction request cited public records showing the disqualifying campaign contributions consisted of $1,000 Bilodeau received from one of the tow companies in October 2010 and contributions of $250 each that Dumitru received in 2010.

failed because there was no material conflict of interest for any of the council members and the city council acted reasonably in awarding the OPTS contracts. All Towing now appeals.

## II

## DISCUSSION

A. *Governing Summary Judgment Principles*

Absent a factual dispute, trial is unnecessary. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*) ["The purpose of the law of summary judgment is . . . to cut through the parties' pleadings . . . to determine whether . . . trial is in fact necessary"].) We review the trial court's grant of summary judgment de novo. "In practical effect, we assume the role of a trial court and apply the same rules and standards which govern a trial court's determination of a motion for summary judgment." (*Zavala v. Arce* (1997) 58 Cal.App.4th 915, 925.)

A motion for summary judgment should be granted if the submitted papers show "there is no triable issue as to any material fact" and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) A defendant meets its burden of showing a cause of action has no merit if it shows that one or more elements of the cause of action cannot be established, "or that there is a complete defense to that cause of action." (Code Civ. Proc., § 437c, subd. (p)(2).)

If the moving party carries that burden, it "causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Aguilar*, *supra*, 25 Cal.4th at p. 850.) A triable issue of material fact exists "'if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing

8

the motion in accordance with the applicable standard of proof.' [Citation.] Thus, a party 'cannot avoid summary judgment by asserting facts based on mere speculation and conjecture, but instead must produce admissible evidence raising a triable issue of fact. [Citation.]' [Citation.]" (*Dollinger DeAnza Associates v. Chicago Title Ins. Co.* (2011) 199 Cal.App.4th 1132, 1144-1145.)

B.     *The Trial Court Properly Granted Defendants' Summary Judgment Motion*

All Towing contends disputed issues of material fact on each of its four causes of action precluded the trial court from granting summary judgment. Summary judgment is proper only if it disposes of the entire lawsuit. (Code Civ. Proc., § 437c, subd. (c); *Khan v. Shiley, Inc.* (1990) 217 Cal.App.3d 848, 859, fn. 16; cf. Code Civ. Proc., § 437c, subd. (f) [providing for partial judgment by summary adjudication of individual causes of action].) Accordingly, we must review whether the trial court properly concluded defendants were entitled to judgment as a matter of law on each cause of action. We discuss each cause of action in turn.

1.     First Cause of Action: Whitaker's Alleged Financial Conflict of Interest

All Towing alleged in its first cause of action that Whitaker had a financial conflict of interest that precluded him under the PRA from participating in the towing contract vote. The PRA "precludes an elected official from participating in a decision in which he has 'a financial interest' (Gov. Code, § 87100) . . . ." (*Woodland Hills Residents Assn., Inc. v. City Council* (1980) 26 Cal.3d 938, 945-946 (*Woodland Hills*).) The parties stipulated for summary judgment purposes that Cardlock Fuels (Cardlock) and its associated distribution company, SC Fuels, were clients of Whitaker's law firm, and therefore constituted a source of income for Whitaker, thus affecting his financial interests.

9

But Whitaker and the city carried their initial burden to show they were entitled to judgment as a matter of law because no evidence suggested that denying or awarding All Towing any share of the police towing contract would have *any* effect on SC Fuels' or Cardlock's financial interests, and therefore the contract award had no discernible "ripple" effect on Whitaker's financial interests. All Towing in its opposition to summary judgment made no argument and presented no facts, disputed or undisputed, to suggest the towing contract would affect SC Fuels or Cardlock in any manner. Neither fuel company owned, operated, or had any discernible financial interest in any of the towing companies under consideration for the towing contract. And by failing to mention any particulars concerning Whitaker in its summary judgment opposition, All Towing failed to even *suggest* any factual basis implicating Whitaker in a conflict of interest arising from the towing contract vote. Instead, All Towing's opposition focused on Bilodeau's and Dumitru's alleged conflicts of interest based on receipt of campaign contributions. But this did not implicate Whitaker in any PRA violations that All Towing alleged generally in its first cause of action.

Noting All Towing did not use SC Fuels or Cardlock to fuel its tow trucks, All Towing now argues on appeal that "*if* the . . . companies approved for the OPTS[A] instead of Plaintiff use[d] SC Fuels or Cardlock for [their] fueling needs, SC Fuels and/or Cardlock" would lose the opportunity for increased fuel sales "if Plaintiff were assigned the OPTS[A], another fact to be proven at trial." (Italics added.) Such speculation, however, comes far too late and in any event is insufficient. On appeal, we must "take the facts from the record that was before the trial court when it ruled on" the summary judgment motion. (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 716-717.) Moreover, "substantial responsive evidence" is required to oppose summary judgment

10

and "mere speculation . . . is insufficient to establish a triable issue of fact."  (*Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 163.)  Accordingly, we find unavailing All Towing's further speculation on appeal that "[i]t is also possible that Whitaker accepted contributions from SC Fuels to keep Plaintiff from the OPTS[A]" and that Whitaker in an unspecified manner intended his towing vote to curry favor with SC Fuels or Cardlock.

All Towing on appeal blames its trial attorney for its inadequate summary judgment opposition.  All Towing asserts the dearth of any facts (or argument) concerning Whitaker in its opposition is of little import.  According to All Towing, when a party opposes a summary judgment motion, "All that needs to be done at this juncture is allege that certain facts took place that were illegal, show harm done to the plaintiff, and ask the court for relief.  All of those things have been done here.  It is of no concern whether Plaintiff has any evidence at this point."  According to All Towing, it simply "needs to go through the discovery process in order to get that proof."

All Towing displays a poor grasp of summary judgment practice.  Far from ancillary, evidence could not be more central to summary judgment proceedings.  Allegations alone are not sufficient.  The moving party bears an initial burden to move beyond mere allegations and present evidence sufficient to show it is entitled to summary adjudication as a matter of law.  (Code Civ. Proc., § 437c, subds. (c) & (f)(2).)  Once the moving party meets that burden, the party opposing summary judgment "'must produce admissible evidence raising a triable issue of fact. [Citation.]' [Citation.]" (*Dollinger*, *supra*, 199 Cal.App.4th at pp. 1144-1145.)  "The plaintiff . . . may not rely upon the mere allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact

11

exists as to that cause of action or a defense thereto." (Code Civ. Proc., § 437c, subd. (p)(2).)

Defendants did not move for summary judgment until almost a year after All Towing filed its complaint, the parties had ample time to conduct discovery, and All Towing never sought a continuance to conduct further discovery. The trial court has no discretion to refuse summary judgment when the evidence before it raises no triable issues of fact (*Krasley v. Superior Court* (1980) 101 Cal.App.3d 425, 432), and All Towing's challenge on appeal concerning its first cause of action therefore fails. The trial court properly resolved the first cause of action on summary judgment absent any facts in All Towing's opposition to suggest Whitaker had a conflict of interest under the PRA.

    2.    Second and Third Causes of Action: Bilodeau's and Dumitru's Receipt of Campaign Contributions Allegedly Violating the PRA

All Towing alleged in its second cause of action that Bilodeau's receipt of more than $250 in campaign contributions in an earlier election cycle from a company vying for the towing contract violated the PRA. All Towing alleged the same against Dumitru in its third cause of action. All Towing contends recent campaign contributions furnish a basis to state a claim under the PRA against a public official sufficient to withstand summary judgment. All Towing relies on a statement in *BreakZone*, *supra*, 81 Cal.App.4th at p. 1227, that declares categorically: "The Political Reform Act (Gov. Code, § 81000 et seq.) creates a statutory obligation on the part of a public official to whom that act applies not to vote on a matter if he or she has received campaign contributions from a donor aggregating $250 or more within 12 months prior to the time the decision is made."

12

Defendants contend this statement is dictum because no party in *BreakZone* alleged a violation of the PRA stemming from campaign contributions.  Rather, the *BreakZone* plaintiff claimed that campaign contributions totaling $9,000 given to council members considering the plaintiff's request for a variance (conditional use permit) violated the plaintiff's due process right to a fair hearing because the contributors opposed the variance.  The *BreakZone* plaintiff did not mention the PRA, perhaps because as a statutory enactment, the PRA does not necessarily follow or define the contours of constitutional due process.

On the other hand, the reviewing court in *BreakZone* presumably turned to the PRA for a sense of what constitutes fair play in political decisionmaking, and therefore its discussion of the PRA was relevant to its due process inquiry.  But the *BreakZone* court devoted little analysis to the PRA, quickly passing over it in a footnoted conclusion that the act did not apply because the contributions in that case occurred 17 months before the variance hearing, outside "the threshold for application of section 87103 within 12 months prior to the vote in question."  (*BreakZone*, *supra*, 81 Cal.App.4th at pp. 1227, fn. 18.)  Such cursory treatment affords little confidence in the pronouncement about the PRA on which All Towing relies.  (See *People v. Mendoza* (2000) 23 Cal.4th 896, 915 [courts "'must view with caution seemingly categorical directives not essential to earlier decisions'"]; 16 Cal.Jur.3d (2012) Courts, § 297 [same].)

Whether the statement in *BreakZone* that campaign contributions require recusal under the PRA is dictum or not, it is wrong.  The Supreme Court in *Woodland Hills* recognized that while the PRA "precludes an elected official from participating in a decision in which he has a 'financial interest' [citation], *it expressly excludes from the*

13

*definition of 'financial interest' the receipt of campaign contributions*." (*Woodland Hills*, *supra*, 26 Cal.3d at pp. 945-946, fn. omitted, italics added.) It appears *BreakZone* assumed in its brief, footnoted discussion of the PRA that the definition of "financial interest" in section 87103 *included* campaign contributions as a "Gift" or "Income" requiring recusal for amounts more than $250 within 12 months of a challenged decision. To the contrary, however, the PRA's definitions of "Gift" and "Income" now and at the time *BreakZone* was decided *expressly exclude campaign contributions*. (§§ 82028, subd. (b) ["The term 'gift' does not include: [¶] . . . [¶] (4) Campaign contributions required to be reported under Chapter 4 of this title"]; 82030, subd. (b) ["Income also does not include: [¶] (1) Campaign contributions required to be reported under Chapter 4 of this title"].) As the Supreme Court explained, the PRA "provides for disclosure of campaign contributions by recipients of contributions rather than disqualification of recipients from acting in matters in which the recipient is interested." (*Woodland Hills*, at p. 945.)

The Supreme Court also explained that the PRA exclusion for campaign contributions serves both practical and constitutional ends. As a practical example, the court noted: "If a political contribution automatically disqualifies the recipient after his election from considering and acting on matters in which the contributor has an interest, the enterprising developer could disqualify all known environmentalists who are running for municipal office by making nominal contributions to the campaign committees of such persons. Future applications of the developer could then be judged by a panel from which all known environmentalists have been disqualified." (*Woodland Hills*, *supra*, 26 Cal.3d at p. 947, fn. 9.)

14

The Supreme Court further explained that "[t]o disqualify a city council member from acting on a development proposal because the developer had made a campaign contribution to that member would threaten constitutionally protected political speech and associational freedoms." (*Woodland Hills*, *supra*, 26 Cal.3d at p. 946.) For instance, it would curtail the right of contributors such as "developers, builders, engineers, and attorneys who are related in some fashion to developers . . . to participate in the electoral process." (*Id.* at p. 947.) Accordingly, the high court concluded that the PRA in "dealing comprehensively with problems of campaign contribution and conflict of interest . . . does not prevent a city council member from acting upon a matter involving the contributor." (*Id.* at p. 946.)

All Towing relies on the fact *BreakZone* was decided 20 years after *Woodland Hills* and has met no published disagreement. Neither of these features rehabilitates *BreakZone*'s erroneous disqualification statement. The practical and constitutional considerations the Supreme Court noted in *Woodland Hills* still apply. Moreover, the PRA's express exclusions for ordinary campaign contributions remain unchanged. (§§ 82028, subd. (b)(4); 82030, subd. (b)(1).) We may not ignore the express language of a statute. (*California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 698 [court may not add to or alter the words of a statute].)

Significantly, the terms of the PRA reflect the Legislature knew how to specify it applied to campaign contributions involving public agencies, but *not* to decisions by officials in their elected office. Specifically, section 84308 provides, "No officer of an agency shall accept, solicit, or direct a contribution of more than two hundred fifty dollars ($250) from any party . . . while a proceeding involving a license,

15

permit, or other entitlement for use is pending before the agency . . . ." But section 84308, subdivision (a)(3), specifically excludes from the PRA's definition of "agency" those "local governmental agencies whose members are directly elected by the voters," which indisputably is the case for city council members like Bilodeau and Dumitru. As the Supreme Court in *Woodland Hills* explained, criminal sanctions for political corruption and the PRA's contribution disclosure requirements protect against bias and any appearance of unfairness. (*Woodland Hills*, *supra*, 26 Cal.3d at p. 947.) Given the foregoing and that the high court more than 30 years ago explained the PRA "expressly excludes from the definition of 'financial interest' the receipt of campaign contributions" (*id.* at pp. 945-946, fn. omitted), we part ways with *BreakZone*. Because the campaign contributions here furnished no basis for a cause of action under the PRA, the trial court properly granted summary judgment on All Towing's attempt under the PRA to void the city council's towing contract decision and disqualify Bilodeau and Dumitru.

   3. Fourth and Final Cause of Action: Alleged Common Law Conflict of Interest

    All Towing in its fourth cause of action asserted a common law conflict of interest claim against Whitaker, Bilodeau, and Dumitru. Though not cited by either party, section 1090 is relevant to All Towing's claim. The Legislature in section 1090 and its predecessor statutes codified the common law prohibition against conflicts of interests involving government officials. Section 1090 predates the PRA by several decades and continues to coexist alongside it. Section 1090 provides in pertinent part: "Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members."

The court in *Carson Redevelopment Agency v. Padilla* (2006) 140 Cal.App.4th 1323, 1329-1330, traced the common law origins of section 1090. "As history reveals, there has long been a common law proscription against public officials having a financial interest in contracts created by them in their official capacities. [Citation.] In 1951, the Legislature codified the proscription when it enacted section 1090 to curb conflicts of interest with respect to contracts, purchases and sales made by public officials."

Unlike the PRA, which furnishes a private right of action under which for "any person residing in the jurisdiction may sue for injunctive relief to enjoin violations or to compel compliance" (§ 91003) with that statute's requirements, section 1090 et seq. provide simply that a contract in which a public official is interested is void (§ 1092; *Klistoff v. Superior Court* (2007) 157 Cal.App.4th 469, 481 [contract is void, not merely voidable]) and that the offending official may be fined or imprisoned "and is forever disqualified from holding any office in this state" (§ 1097). In providing for injunctive and compulsory relief, the PRA makes improper official action void. Specifically, "[i]f it is ultimately determined that a violation has occurred and that the official action might not otherwise have been taken or approved, the court may set the official action aside as void." (§ 91003.) But neither the PRA or section 1090 et seq. provide for the $2,000,000 in damages All Towing sought in its fourth cause of action. Indeed, neither contemplates a damages award, with the PRA providing at most that "[t]he court may award to a plaintiff or defendant who prevails his costs of litigation, including reasonable attorney's fees." (§ 91003.)

The court in *BreakZone* considered the interesting question whether a common law cause of action for official conflict of interest survives the enactment of the

17

PRA and section 1090. *Woodland Hills* did not address the question, but the *BreakZone* court noted language predating *Woodland Hills* suggested an enduring common law public policy against conflicts of interest. "Thus, in *Terry v. Bender* [1956] 143 Cal.App.2d 198, a case in which it was alleged that a public official had a disqualifying personal interest in a public contract, the court stated: 'A public office is a public trust created in the interest and for the benefit of the people. Public officers are obligated . . . to discharge their responsibilities with integrity and fidelity. . . . [T]hey may not exploit or prostitute their official position for their private benefits. When public officials are influenced in the performance of their public duties by base and improper considerations of personal advantage, they violate their oath of office and vitiate the trust reposed in them, and the public is injured by being deprived of their loyal and honest services. It is therefore the general policy of this state that public officers shall not have a personal interest in any contract made in their official capacity.' [Citation.]" (*BreakZone*, *supra*, 81 Cal.App.4th at p. 1232.) The court in *Stockton P. & S. Co. v. Wheeler* (1924) 68 Cal.App. 592, 601, similarly explained long ago that the conflict of interest "principle has always been one of the essential attributes of every rational system of positive law . . . ."

But the *BreakZone* court aptly cautioned against continued conflict of interest policymaking through judicial common law, emphasizing: "'Except where the law clearly provides rules for identification and rectification of what might be termed conflicts of interest, that is a legislative not a judicial function. [Citations.]' [Citation." (*BreakZone*, *supra*, 81 Cal.App.4th at p. 1233.) Ultimately, the court in *BreakZone* determined it did not have to resolve whether a common law cause of action for conflict of interest retained vitality despite the PRA and section 1090 et seq. We reach the same

18

conclusion here. The *BreakZone* court explained: "While the common law may recognize the appearance of unfairness, and provide remedies, such as writs of mandate, for allegations of denial of a fair hearing, BreakZone has not made the necessary record to invoke those protections, whether they be founded on statute or common law." (*Ibid.*)

The same is true here. In *Mike Moore's 24-Hour Towing v. City of San Diego* (1996) 45 Cal.App.4th 1294 (*Mike Moore*'s), where the city awarded five-year contracts for vehicle towing similar to the OPTS agreement here, the court explained that "[a] public entity's 'award of a contract and all of the acts leading up to the award are legislative in character.'" (*Id.* at p. 1303.) Accordingly, "'[t]he letting of contracts by a governmental entity necessarily requires an exercise of discretion guided by considerations of the public welfare,'" and therefore, "[r]eview of a local entity's legislative determination is through ordinary mandamus under [Code of Civil Procedure] section 1085." (*Mike Moore's*, at p. 1303.) "'Such review is limited to an inquiry into whether the action was arbitrary, capricious or entirely lacking in evidentiary support,'" but the "test has also been formulated to add an inquiry whether the agency's decision was '*contrary to established public policy* or unlawful or procedurally unfair.'" (*Ibid.*, italics added.)

All Towing did not, as the trial court and defendants noted below, file a mandamus petition (Code Civ. Proc., § 1085) to challenge the city council's towing contract decision. All Towing did not otherwise in its fourth cause of action seek or mention administrative mandamus. But neither the trial court or defendants have identified any manner in which this procedural misstep prevented adjudication of the merits of All Towing's claim. For example, All Towing's complaint fell within the strict 90-day deadline for challenging local government or agency action by administrative

19

mandamus (Code Civ. Proc., § 1094.6, subd. (b)) and met the mandamus petition verification requirement (*id.*, § 1086).

Defendants assert as they did below that treating the complaint as a petition for mandate did nothing for All Towing to avoid summary judgment because several rational explanations for the city council's towing contract decision meant the decision could not be called arbitrary or capricious as required for mandamus relief. But this analysis misses the mark because the mandamus "inquiry [includes] whether the . . . decision was 'contrary to established public policy'" (*Mike Moore's*, *supra*, 45 Cal.App.4th at p. 1303), and the gravamen of All Towing's fourth cause of action was that a government official's conflict of interest violates longstanding common law public policy.

Nevertheless, even assuming arguendo as the trial court did that All Towing's complaint may be treated as a mandamus petition, the trial court properly granted defendants summary judgment. Simply put, as discussed, in opposing summary judgment All Towing produced no facts, nor even any argument, to suggest Whitaker suffered any actual conflict of interest concerning All Towing. And as a matter of law the campaign contributions Bilodeau and Dumitru received do not constitute a conflict of interest.

As we explained in upholding summary resolution of All Towing's first cause of action against Whitaker, it is axiomatic that the party opposing summary judgment "'"must produce admissible evidence raising a triable issue of fact. [Citation.]' [Citation.]" (*Dollinger*, *supra*, 199 Cal.App.4th at pp. 1144-1145.) This requirement is black letter law (Code Civ. Proc., § 437c, subd. (p)(2)) that applies whether the alleged cause of action is statutory or under the common law. All Towing did not mention

20

Whitaker in its opposition to summary judgment, nor reference any facts concerning him in its cursory separate statement of facts, and therefore the trial court properly resolved in a summary fashion not only the first cause of action but the analogous common law claim against Whitaker in All Towing's fourth cause of action.

Similarly, the remainder of All Towing's fourth cause of action alleging common law conflict of interest against Bilodeau and Dumitru fails for the same reasons as the second and third causes of action. Specifically, the practical and constitutional considerations the Supreme Court identified in *Woodland Hills* also apply here. In other words, the practical reality that a campaign contribution disqualification rule could be easily manipulated and abused counsels against finding such a rule in the common law or adopting it by judicial fiat. All Towing points to no judicial decision or common law authority establishing such a rule. Adopting such a sweeping rule would also violate the First Amendment rights of those who wish to participate in the electoral process by making campaign contributions, as the Supreme Court explained in *Woodland Hills*.

In *BreakZone*, the court contemplated the possibility that a particular campaign contribution could cross the line into bribery. "We contrast the facts of this case with one in which it is alleged the campaign contribution is made for an express promise to act in a particular way in exercising governmental authority with respect to a particular matter then pending or which may be presented for governmental review and action at a later date." (*BreakZone*, *supra*, 81 Cal.App.4th at p. 1233.) The court also "d[id] not foreclose a circumstance in which an earlier governmental action is 'rewarded' in an illegal manner," but explained, "No such factual circumstance[s are] alleged in the instant case." (*Ibid.*) The same is true here, and we also observe such factual scenarios do not necessarily establish a need for a judicially-created common law remedy given the

21

existing criminal sanctions for bribery and political corruption.  (*Woodland Hills*, *supra*, 26 Cal.3d at p. 947, citing Pen. Code, §§ 67 et seq.; 165.)  For all the foregoing reasons, the trial court properly granted summary judgment and All Towing's challenges on appeal have no merit.

III

DISPOSITION

The judgment is affirmed.  Respondents are entitled to their costs on appeal.


ARONSON, ACTING P. J.

WE CONCUR:


IKOLA, J.


THOMPSON, J.

22